## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**JONATHON W. TROWBRIDGE,**              Case No. 3:19 CV 2356

      Plaintiff,

      v.                                                    Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                    MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Jonathon W. Trowbridge ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 11). For the reasons stated below, the Court reverses and remands the decision of the Commissioner.

### PROCEDURAL BACKGROUND

Plaintiff filed for SSI in October 2016, alleging a disability onset date of October 1, 2014. (Tr. 164-72). His claims were denied initially and upon reconsideration. (Tr. 67, 85). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before an administrative law judge ("ALJ") on August 28, 2018. (Tr. 34-52). On October 2, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 15-27). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the

Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on October 9, 2019. (Doc. 1).

## FACTUAL BACKGROUND[1]

Personal Background & Testimony

Born in 1994, Plaintiff was 22 years old on the date his SSI application was filed. *See* Tr. 164. He originally alleged disability due to pervasive developmental disorder, autism, ADHD, and anxiety disorder. (Tr. 195). Plaintiff lived with his parents. (Tr. 37).

In an October 2016 Function Report, Plaintiff alleged he could not work, in part, because he "physically could not do" many things he tried. (Tr. 210). He described a typical day as getting up, getting dressed, eating breakfast, watching television, and using a computer. (Tr. 211). He said he could not ride his bike or "do anything strenuous without almost passing out." *Id.* He "struggle[d] to walk too far." (Tr. 213). He cooked simple meals, ran the sweeper, did his laundry, and took out the trash, noting he could do so only for a "short duration" due to fatigue, as well as burning, numbness, and tingling. (Tr. 212). He did not drive because he was unable to move his leg from the gas pedal to the brake quickly enough. (Tr. 213). He attended church, appointments, and errands with relatives or friends. (Tr. 213-14). Prior to his illness, he was more active; he played paintball, rode a bike, and jumped on a trampoline. (Tr. 214). Plaintiff estimated he could lift ten or fifteen pounds, but prolonged lifting caused him to almost pass out. (Tr. 215). Repeated bending caused fatigue, and squatting caused shaking. *Id.* He could stand

---

1. Although Plaintiff alleged disability due to both physical and mental impairments, and summarizes evidence regarding both in his brief (*see* Doc. 13, at 4-13), his substantive arguments are directly only at the ALJ's evaluation of his *physical* condition (*see* Doc. 13, at 15-24). As such, the undersigned summarizes only that evidence related to Plaintiff's physical impairments herein.

"for awhile, but not a 4 hour shift". *Id.* His ability to walk "long periods [was] impaired" and he could "sometimes" walk for 20 to 30 minutes. *Id.*

At the administrative hearing, Plaintiff testified his fatigue and memory problems prevented him from working full time. (Tr. 38). He estimated the furthest he could walk was a quarter mile before feeling fatigued and a burning sensation in his leg. (Tr. 38-39). He could stand for one hour. (Tr. 39) He could bend or squat for short time periods (Tr. 39), but squatting for an extended period of time caused him to shake and fall over (Tr. 42-43). He was unsure how much he could lift, explaining that he had the strength, but not the energy. (Tr. 39). He estimated he could sit for three to four hours before needing to get up and walk around. *Id.*

Plaintiff typically slept for six and a half to eight hours at night, and napped for about three hours during the day. (Tr. 40). He could shower, run the sweeper, make "about one meal in a day", and do laundry, but he got tired and had to sit after each chore. (Tr. 40). He described making homemade meatball subs, homemade pizzas, and tacos for his family, but these "took a lot out of [him]". (Tr. 43). Plaintiff could not wash dishes because holding his arms in front of his body caused pain. (Tr. 40-41).

Plaintiff previously bicycled and played ultimate frisbee, but stopped both around age 20 because he "started getting worse with feeling more tired." (Tr. 41). His hobby was computer gaming, and he also sometimes attended college-age ministry at his church. (Tr. 41-42).

Plaintiff had attempted to work in the past. (Tr. 43-45). At his last job, he had difficulty with using the computer cash register. (Tr. 44). Prior to that, in 2014 when he "had a bit more energy", he did part-time janitorial work. *Id.* He was "[w]iped out" after a four-hour shift. (Tr. 44-45).

3

<u>Relevant Medical Evidence</u>

March 2015 lab results show Plaintiff had insufficient Vitamin D, and his ALT was elevated. (Tr. 365-66).

A May 2015 echocardiograph, performed due to chest pressure and fatigue, showed low-normal left ventricular systolic function, trace to mild mitral regurgitation, trace tricuspid regurgitation, and trace/mild pulmonic regurgitation. (Tr. 369).

Two months later, Plaintiff told cardiologist Ronald Conner, M.D., he had significant exertional fatigue and frequent lightheadedness/dizziness. (Tr. 457). Plaintiff completed a treadmill stress test, which resulted in calf cramping and was negative for ischemia. (Tr. 457). Dr. Connor characterized Plaintiff's echocardiogram as an "overall reassuring study" and his physical examination was unremarkable. (Tr. 457-58). Dr. Connor diagnosed dysautonomia with joint hypermobility syndrome for which he prescribed midodrine. *Id.* He further diagnosed chronic fatigue, noting Plaintiff was "being worked up for possible mitochondrial defect." *Id.*

Two weeks later, Plaintiff saw Rachel VanNiel, CNP, reporting fatigue (Tr. 363-64). Ms. VanNiel noted Plaintiff "has features of Marfan's, Muscular Dystrophy, and MS" and thought his "broad symptoms and family history" indicated the need for "a wide net" of future testing; she ordered an EEG. (Tr. 364).

In August 2015, Plaintiff saw Dr. Conner again. He followed-up for syncope-related orthostasis and again reported dizziness. (Tr. 455). His physical examination was unremarkable. (Tr. 455-56). Dr. Conner assessed dysautonomia, noting he would modify Plaintiff's midodrine dosage, but might change medication "[i]f he continues to have low blood pressure issues and fatigue." (Tr. 456). He further counseled Plaintiff regarding of diet and exercise, encouraging fifteen to twenty minutes of aerobic exercise three to four days per week. *Id.*

4

At a visit with Dr. Conner in November 2015, Plaintiff's blood pressure was better, but he reported decreased energy, being sleepy during the day, lightheadedness, and dizziness. (Tr. 452). Plaintiff stopped taking midodrine because he believed it cause insomnia. *Id.* He further noted he was awaiting biopsy results for mitochondrial defects. *Id.* Plaintiff's physical examination was unremarkable. (Tr. 452-53). Dr. Connor noted Plaintiff's mild dysautonomia "appear[ed] to be improved" and opined he "suspect[ed] really [his] inactive lifestyle is leading to decrease[d] energy and poor sleep habits." (Tr. 453). He also assessed mild joint hypermobility syndrome and mild mitral regurgitation. *Id.*

In February 2016, Plaintiff sought to establish care with the ProMedica Toledo Hospital Family Residency. (Tr. 501). His mother told the doctor that he had low energy, needed to take breaks when helping with things like groceries, and got dizzy with lifting and carrying. *Id.* His physical examination was unremarkable. (Tr. 504). The doctor ordered lab work, and assessed, *inter alia*, chronic fatigue syndrome, dysautonomia with paresthesias, and vitamin D deficiency. (Tr. 505). She referred Plaintiff to neurology for his dysautonomia, noting he had features of both multiple sclerosis and muscular dystrophy. *Id.*

Plaintiff returned to Dr. Conner's practice in May 2016 and saw Todd Monroe, M.D. (Tr. 450-51). Dr. Monroe noted Plaintiff "[did] not really report any significant symptoms", but got "a little dizzy and lightheaded sometimes with position changes." (Tr. 450). He also described fatigue and a burning sensation in his lower left leg with exercise." Dr. Monroe noted Plaintiff's echocardiogram "was basically unremarkable", as was his physical examination. (Tr. 450-51). Dr. Monroe noted Plaintiff "ha[d] no specific cardiac complaints" and he "did not recommend any changes to his present regimen." *Id.* He instructed Plaintiff to return in one year. *Id.* A left

lower extremity venous duplex study performed at Dr. Monroe's order was negative for deep vein thrombosis. (Tr. 477).

Plaintiff returned to the Toledo Hospital Family Residency in June, reporting numbness and tingling in his bilateral lower extremities/toes after riding a bike a few days prior. (Tr. 492). He also stated he felt like he was going to pass out, and he felt fatigued for the entire day following. *Id.* Plaintiff denied dizziness. *Id.* His physical examination was unremarkable except for obesity; he had a normal gait and "[n]o mobility limitations". (Tr. 495). The provider assessed paresthesias, chronic fatigue syndrome, and generalized muscle weakness. *Id.* He was instructed to continue testing and follow up with specialists, as well as keep his appointment for an EMG in July. *Id.* That EMG was normal. (Tr. 506-07).

That same month, Plaintiff saw neurologist Boyd Koffman, M.D., for muscle weakness and fatigue. (Tr. 656-57). He described easy fatiguability which had progressed over the last four to five years; he had difficulty lifting weights, carrying groceries, and "running on a treadmill for more than ½ a mile without taking a break." (Tr. 657). He also described occasional muscle twitching and hand tremors, as well as feeling lightheaded on standing. *Id.* Dr. Koffman ordered lab work and an EMG/NCS. (Tr. 658).

At a follow-up appointment at the Toledo Hospital Family Residency Program in October, Plaintiff reported some fatigue with increased activity over the weekend, which resolved once he stopped to rest. (Tr. 482). He denied dizziness. *Id.* He noted his paresthesia only occurred during exercise. *Id.* "He experience[d] thigh and calf burning during exercising and it is gone at rest." *Id.* In the "Review of Systems" notes, the provider noted Plaintiff had "no difficulty walking." *Id.* His physical examination was again normal, and his vitamin D level was again noted to be low. (Tr. 485). The provider assessed vitamin D deficiency, paresthesias, and

sedentary lifestyle. (Tr. 486). The provider advised Plaintiff to exercise and ordered lab work to check his vitamin B12 level. *Id.* He observed that Plaintiff's vitamin D deficiency was likely due to his dietary inadequacies and that he was rarely outside, and that his paresthesias was due to a lack of movement and potentially low B12; he encouraged Plaintiff to exercise at least thirty minutes three times per week. *Id.*

In November 2016, Plaintiff underwent a vocational evaluation with Anne Savage Veh, MA, LPCC, CLCP. (Tr. 660-73). Plaintiff told Ms. Veh that he tires easily and required frequent breaks at a prior job. (Tr. 662). He also reported difficulty crouching, and that his hands trembled at times. *Id.* The evaluation focused primarily on Plaintiff's mental abilities as they relate to work, but Ms. Veh also noted Plaintiff "does report fatigue with physical exertion so the job would need to be sedentary to light in nature at this time". (Tr. 670).

In December 2016, Plaintiff sought a second opinion with Roberta Guibord, D.O., reporting he was concerned about his health, including hand tremors. (Tr. 593). Plaintiff's physical examination was unremarkable, including normal ambulation. (Tr. 595). Dr. Guibord assessed, *inter alia*, fatigue, vitamin D deficiency, and vitamin B12 disorder; she ordered lab work. (Tr. 596). Plaintiff returned the following month to review his lab work. (Tr. 597). Dr. Guibord assessed showed elevated liver enzymes and vitamin D deficiency as well as a heterozygous methylenetetrahydrofolate reductase (MTHFR) mutation. *See* Tr. 599-600.

In January 2017, Plaintiff returned to Dr. Koffman. (Tr. 650). Plaintiff reported muscle weakness, muscle fatigue, and familial dysautonomia. (Tr. 651). He described symptoms of shortness of breath while walking, feeling lightheaded on standing, extreme fatigue with exertion, muscle, joint, and back pain, as well as fatigue that "comes and goes". *Id.* He described episodes of near syncope during exertion, intermittent hand and arm tremors, and intermittent

numbness in his fingers and lower legs. (Tr. 652). Dr. Koffman noted a prior brain and cervical spine MRI, EMG/NCS, and other labs were normal. *Id.* On examination, Plaintiff had normal bulk, tone, strength, sensation, coordination, and reflexes. (Tr. 653). He had a narrow-based gait with a normal stride. *Id.* He referred Plaintiff to a pediatric neurologist (Dr. Cameron) and cardiologist for further consultation, noting he was considering a genetic disorder and dysautonomia. (Tr. 654).

In February 2017, neurologist Rebecca Kuenzler, M.D., evaluated Plaintiff for myopathy, possible mitochondrial problems, and possible autonomic problems. (Tr. 691). Plaintiff's mother reported he always had "less energy", but this worsened beginning in 2014. *Id.* Plaintiff again described hand tremors and twitches, intermittent foot and hand numbness, and shaking legs with squatting. *Id.* Dr. Kuenzler noted Plaintiff had a history of elevated ALT and that his vitamin D level was low despite supplementation. *Id.* On examination, Dr. Kuenzler noted Plaintiff had non-tender joints, minimal peripheral edema, a hypermobile range of motion, no paraspinal tenderness, and a simian crease and short fifth digit in both hands. (Tr. 693). On neurological examination, he had increased reflexes (3+), intact sensation, and an intact gait. *Id.* Dr. Kuenzler noted she agreed with a plan for chromosomal microarray and fragile X testing as recommended by the pediatric neurologist and referred Plaintiff to a geneticist. *Id.*; *see also* Tr. 644, 709 (Donald Cameron, M.D.'s referral of Plaintiff to a geneticist).

Plaintiff returned to Dr. Koffman in July. (Tr. 812). He continued to report weakness, dizziness, numbness, and fatigue. (Tr. 814). Plaintiff had normal muscle bulk, tone, and strength; he also had normal reflexes, coordination, sensation, and gait. (Tr. 816). Dr. Koffman noted Plaintiff's 2017 chromosomal array evaluation was normal and his 2017 evaluation for mitochondrial dysfunction was negative. (Tr. 817). Dr. Koffman ordered a liver ultrasound and

lab work, and referred Plaintiff to a gastroenterologist for right upper quadrant pain. *Id.* The liver ultrasound showed "[c]oarse and echogenic liver suggesting diffuse hepatocellular disease, most likely hepatic steatosis." (Tr. 783).

In August, Plaintiff saw rheumatologist Bashar Kahaleh, M.D. (Tr. 806). On examination, Dr. Kahaleh noted Plaintiff ambulated normally, and had normal reflexes and sensation. (Tr. 808-09). His musculoskeletal examination was normal except for hypermobility in his ankles, PIP and DIP joints bilaterally. (Tr. 809). Dr. Kahaleh noted Plaintiff "had significant testing done to identify the etiology of his hypermobility", but it was all normal. *Id.* He "[s]uspect[ed] Marphanoid syndrome", and diagnosed hypermobility syndrome and disorder of connective tissue. *Id.*

At a November 2017 emergency room visit for a rash, Plaintiff stated he was "well otherwise". (Tr. 834).

In February 2018, Plaintiff returned to Dr. Koffman with chief complaints of fatigue and dyspnea on exertion. (Tr. 780). He described muscle weakness and swelling in his extremities, as well as weakness, dizziness, and restless legs. (Tr. 782). Dr. Koffman noted Plaintiff denied having near syncopal episodes "in quite a while", but experienced difficulty walking beyond a certain distance due to burning leg pain and turning pale. (Tr. 783). His muscle tone, bulk, and strength were normal on examination, as were his reflexes and coordination; his gait had a narrow base and normal stride. (Tr. 785). Dr. Koffman surmised that the only neurologic lesion he "could conceive of based on symptoms of impaired endurance is mitochondrial cytopathy". (Tr. 786). He also noted Plaintiff's shortness of breath on exertion could be "related to deconditioning and obesity", and that his autoimmune hepatitis "may contribute to fatigue." *Id.* He referred Plaintiff to neurosurgery for a muscle biopsy to exclude mitochondrial cytopathy. *Id.*

In March 2018, Plaintiff saw neurosurgeon Azedine Medhkour, M.D. (Tr. 776). He reported reduced endurance, tiring easily, lightheadedness, and burning and shortness of breath when walking. *Id.* On examination, he had normal reflexes, sensation, gait, and station. (Tr. 779). Dr. Medhkour diagnosed muscle fatigue and ordered a muscle biopsy. (Tr. 778-79). He noted that Plaintiff "has seen Pulmonary, Rheumatology and Cardiology and the[y] have no explanation for his complaints." (Tr. 779).

Plaintiff underwent the muscle biopsy and results showed "a number of mitochondria with abnormal morphology" which was "suggestive of a potential metabolic problem or a mitochondriopathy." (Tr. 823). At a follow-up with Dr. Medhkour later in March, Plaintiff continued to report muscle aches, weakness, and fatigue. (Tr. 775). He had normal muscle bulk, tone, and strength on examination. (Tr. 776). Dr. Medhkour diagnosed mitochondrial myopathy and instructed Plaintiff to follow up with Dr. Koffman "for . . . refer[r]als and possible treatment based off of the biopsy results." *Id.*

In June 2018, Plaintiff saw pediatric neurologist Marvin Natowicz, M.D. (Tr. 851). Plaintiff again reported worsening fatigue, lightheadedness, hand tremors, and muscle twitches since 2014. (Tr. 851-52). Dr. Natowicz summarized Plaintiff's muscle biopsy results, among other testing (Tr. 853). On examination, he noted Plaintiff had "[bilateral] pes planus but otherwise normal gait", normal extremity strength and tone with no involuntary movements, normal reflexes, and intact sensation. (Tr. 858). He explained there was no cardiopulmonary basis for Plaintiff's exercise intolerance and his "weight status and deconditioning are likely contributing factors" as was his liver dysfunction. (Tr. 859). He also observed Plaintiff's evaluation was notable for "increased ALT with hepatic steatosis by CT scan" and "EM of a

10

muscle biopsy showing some morphologically abnormal mitochondria and some myocytes with

excessive lipid droplets." (Tr. 858-59). He further noted:

> The muscle biopsy result raises a question of a primary vs. secondary metabolic
> disorder involving mitochondrial bioenergetics. The diagnostic evaluation for this
> category of conditions has thus far been unremarkable. The work-up for a
> possible syndromic basis of Jonathon's clinical condition has included a normal
> chromosomal microarray analysis. A syndromic condition and an underlying
> metabolic disorder remain considerations, however.

(Tr. 859). Dr. Natowicz's plan was selected metabolic testing, and to save DNA for possible later

molecular genetic testing. *Id.* He further instructed Plaintiff to return in six months. *Id.*

*Opinion Evidence*

In December 2016, State agency physician Ermias Seleshi, M.D., reviewed Plaintiff's

records and determined Plaintiff has no severe physical impairments (Tr. 58) and could perform

heavy or very heavy exertional work (Tr. 64-65). He summarized:

> Clt has been seen and worked up for dysautonomia as well as syncope and some
> numbness complaints. ECHO and other testing fails to demonstrate any
> abnormalities. Physical exam shows likewise benign findings. TS did indicate
> improvement and resolution of symptoms in more recent 2016 notes. There is no
> evidence of a severe physical MDI.

(Tr. 58).

In March 2017, State agency physician Linda Hall, M.D., reviewed Plaintiff's records

and similarly found no severe physical impairment (Tr. 77) and opined Plaintiff could perform

heavy or very heavy work (Tr. 83). In addition to repeating Dr. Seleshi's statement, Dr. Hall

added:

> Recon MER: 2/17 OV: c/o progressive fatiguability, but muscle and neuro exams
> are normal except for dysmorphic features (simian crease and short 5th digit both
> hands). Prior episodes of syncope/near syncope appear to be vasovagal. Possible
> hereditary process, and therefore chromosome testing will be done as there is
> family history of variable issues of PDD and sensory processing disorders.

*Id.*

VE Testimony

A VE appeared and testified at the administrative hearing. (Tr. 46-52). The ALJ asked the VE to consider an individual with Plaintiff's age, education, work experience, and RFC as ultimately determined by the ALJ. *See* Tr. 47-48. The VE testified that such an individual could not perform Plaintiff's past work, but could perform other jobs such as light housekeeper, retail marker, or general office helper. (Tr. 48). The ALJ then added an additional limitation to the hypothetical question that the individual "be allowed to sit or stand, alternating position for one to two minutes in the immediate vicinity of the work station, no more frequently than every 30 minutes." (Tr. 49). The VE said the general office helper job would remain (but at a reduced number), as well as additional jobs such as inspector and assembler. *Id.* The ALJ then added a restriction to sedentary work, to which the VE responded jobs such as inspector, assembler, and toy packer would be available. (Tr. 50). Finally, the ALJ asked the VE about adding limitations of: "two extra breaks of fifteen minutes each per eight-hour shift", "consistently be absent more than two days per month", and "consistently be off-task for than 15% of the work period". *Id.* The VE testified that no work would be available to such an individual. (Tr. 51).

ALJ Decision

In his October 2018 decision, the ALJ found Plaintiff had not engaged in substantial gainful activity since his August 17, 2016 application date. (Tr. 17). The ALJ found Plaintiff had severe impairments of intellectual disorder, anxiety disorder, ADD / ADHD, obesity, and mitochondrial myopathy. *Id.* However, the ALJ found none of these impairments – singly or in combination – met or medically equaled the severity of a listed impairments. (Tr. 19). Thereafter, the ALJ set forth Plaintiff's RFC:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: Postural limitation of no climbing of

ladders, ropes, scaffolds. Environmental limitations to avoid to concentrated exposure to hazards, such as dangerous moving machinery and unprotected heights. No jobs in loud work environments such as heavy traffic noise levels. Work limited to simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work related decisions, with few if any work place changes. Occasional interaction with the general public, coworkers, and supervisors.

(Tr. 20). The ALJ then determined that given Plaintiff's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that he could perform. (Tr. 26). As such, the ALJ found Plaintiff not disabled. *Id.*

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform past relevant work?

5.    Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff presents two arguments. First, he contends the ALJ improperly discounted his symptoms which, he contends, are based on his recently-diagnosed mitochondrial myopathy.

14

Second, he contends the ALJ erred at Step Five when he failed to include in the RFC all limitations that he posed as questions to the VE. For the reasons discussed below, the Court concludes remand is required.

<u>Subjective Symptoms</u>

Plaintiff contends the ALJ failed to properly evaluate Plaintiff's diagnosis of mitochondrial myopathy in relation to his symptoms. (Doc. 13, at 16). Specifically, he argues mitochondrial myopathy "is the source and cause of nearly every impairment identified within the decision." *Id.* He cites medical literature to connect his symptoms to the diagnosis and argues the ALJ erred in discounting those symptoms by relying too heavily on objective findings. *Id.* Preliminarily, although Plaintiff argues that mitochondrial myopathy should be evaluated similarly to rules and caselaw specific to fibromyalgia, he points to no such rule or caselaw requiring the ALJ do so. However, the Court agrees with Plaintiff that the ALJ failed to follow the requirements for evaluating his subjective symptoms and reverses and remands on that basis.

In considering symptoms, an ALJ follows the two-step process prescribed by regulation. An ALJ must first determine whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's alleged symptoms; second, if such an impairment exists, the ALJ must evaluate the intensity, persistence, and limiting effects of those symptoms on the claimant's ability to do basic work activities. 20 C.F.R. § 416.929(a). In making this determination and considering whether a claimant has disabling pain, an ALJ must consider: (1) daily activities; (2) location, duration, frequency, and intensity of pain or symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication; (5) treatment, other than medication, to relieve pain; and (6) any other measures used to relieve pain. 20 C.F.R. § 416.929(c)(3); *see also* SSR 16-3p, 2017 WL

5180304.[2] Although the ALJ must "consider" the listed factors, there is no requirement that he discuss each one. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531. The Sixth Circuit has explained, interpreting SSR 96-7p, the precursor ruling, that a credibility determination will not be disturbed "absent compelling reason", *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), and the Court is thus limited to determining whether the ALJ's reasons are supported by substantial evidence, *Ulman*, 693 F.3d at 713-14 ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess".).

Nevertheless, the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10. Further, as Plaintiff correctly points out (Doc. 13, at 16), the ALJ may not "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms *solely* because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." *Id.* at *5 (emphasis added); *see also* 20 C.F.R. § 416.929(c)(2).

---

2. SSR 16-3p replaced SSR 96-7p and applies to ALJ decisions on or after March 28, 2016. *See* 2017 WL 5180304, at *1, 13. It directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms" and removes the term "credibility". *Id.* at *1. Both rulings, however, refer to the same two-step process articulated in 20 C.F.R. § 404.1529 and the same factors to consider. *See Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016) (noting that the updated ruling was to "clarify that the subjective symptoms evaluation is not an examination of an individual's character") (internal quotation omitted). Thus, "[w]hile the court applies the new SSR, it declines to engage in verbal gymnastics to avoid the term credibility where the usage of the term is most logical." *Pettigrew v. Berryhill*, 2018 WL 3104229, at *14 n.14 (N.D. Ohio), *report and recommendation adopted*, 2018 WL 309369.

The ALJ in this case set forth the two step process (Tr. 20), summarized Plaintiff's testimony (Tr. 21), and found:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Tr. 21). On the following page, the ALJ explained "the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms . . . are inconsistent with the objective findings and examinations", noting that physical examinations "have been generally normal." (Tr. 22). This is certainly an accurate description of the objective findings of record, which generally show unremarkable findings including normal muscle strength and tone, normal reflexes and sensation, and normal gait. *See, e.g.*, Tr. 451, 452-53, 455-56, 458, 485, 495, 504, 595, 653, 693, 785, 816. The ALJ again cited these findings at the end of his RFC analysis:

> While recent genetic testing has shown some positive findings, the claimant retains normal strength and sensation, ambulated normally and no muscle spasms or reflex changes are noted. He is able to assist his grandmother, help with chores including sweeping, preparing simple meals for himself and his family, and is able to do his own laundry.

(Tr. 25).

As noted above, the relevant regulation and ruling prohibit an ALJ from discounting a claimant's subjective symptoms based *solely* on the fact that the objective medical evidence does not confirm their severity. *See* SSR 16-3p, 2017 WL 5180304, at *5; *see also* 20 C.F.R. § 416.929(c)(2). In this case, the only other evidence cited by the ALJ to discount Plaintiff's subjective symptoms were his activities of "assist[ing] his grandmother, help[ing] with chores including sweeping, preparing simple meals for himself and his family, and . . . do[ing] his own laundry." (Tr. 25). As discussed below, however, the ALJ failed to explain his reasoning in this

17

regard such that "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *5.

Inconsistency between one's daily activities and one's subjective symptoms is a valid reason to discount said symptoms. *See Walters*, 127 F.3d at 531. As quoted above, the ALJ accurately described – in a less detailed manner – Plaintiff's self-reported activities. *See* Tr. 25. In his October 2016 Function Report, Plaintiff said he "sometimes" made sandwiches, frozen dinners, and microwaveable meals, did his own laundry, ran the sweeper, or took out a bag of trash. (Tr. 212). However, he also said he only did "short duration things because he [got] tired, or "[got] tingling and almost pass out of [he] do[es] too much too fast." *Id.* At the August 2018 administrative hearing, Plaintiff testified he made a few meals for his family, but they "took a lot out of [him]". (Tr. 43). He also testified he ran the sweeper, made "about one meal in a day", and did laundry, but fatigued easily and had to sit and take breaks after each chore." *Id.*

But the ALJ did not explain how the cited daily activities undermine Plaintiff's subjective report of symptoms, including a limited ability to stand and walk, as well as exertional fatigue. Other courts within this district have found the mere listing of activities without explanation to be insufficient. *See Anthony v. Comm'r of Soc. Sec.*, 2014 WL 4249782, at *8 (N.D. Ohio) ("With regard to Anthony's subjective complaints and daily activities, the ALJ merely noted what Anthony reported as to her complaints and daily activities. The ALJ failed to explain how these activities either support or detract from her credibility. Therefore, contrary to the Commissioner's argument, the ALJ's decision does not demonstrate that the ALJ applied the appropriate credibility analysis."); *Romig v. Astrue*, 2013 WL 1124669, at *5 (N.D. Ohio) ("While the ALJ mentioned some of [the plaintiff's] daily activities, he fails to explain how these activities either support or detract from her credibility.").

18

The ALJ thus failed to explain, and is unclear to the Court, how the cited daily activities contradict Plaintiff's statements that, for example, he could not stand for four hours, could only "sometimes" walk for 20 to 30 minutes (Tr. 215), could only stand for one hour at a time, or walk a quarter mile due to fatigue and burning pain (Tr. 38-39); *see Anthony*, 2014 WL 4249782, at *8; *Romig*, 2013 WL 1124669, at *5. Plaintiff's symptoms, if credited, conflict with the ALJ's assessment that he could perform light work.[3] The Commissioner is correct that the ALJ was not required to credit Plaintiff's subjectively-reported symptoms, but the ALJ's decision here lacks the "specific reasons for the weight given to the individual's symptoms, [which are] consistent with and supported by the evidence, and [are] clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10. Remand is thus required for a proper subjective symptom evaluation.

Questions to VE

Plaintiff secondly argues the ALJ erred in "failing to include all of Plaintiff's impairments in [the] RFC determination." (Doc. 13, at 21). The Commissioner responds that the ALJ did not err.

At Step Five of the sequential analysis, after considering Plaintiff's vocational factors, RFC, and the evidence from the vocational expert ("VE"), the ALJ found Plaintiff was capable of performing work that existed in significant numbers in the national economy. (Tr. 26). The

---

3. Light work requires lifting twenty pounds occasionally and ten pounds frequently and "a good deal of walking or standing". 20 C.F.R. § 416.927(b); *see also* SSR 83–10, 1983 WL 31251, at *5-6 ("Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.").

Commissioner has the burden at Step Five, and to satisfy this burden at Step Five, the ALJ may rely on the testimony of a VE as long as it is in response to a hypothetical that accurately reflects the claimant's physical and mental limitations. *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir.1987). In formulating the hypothetical, the ALJ only needs to incorporate those limitations she accepts as credible. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir.1993) ("It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact."). As described above, the VE testified that – with the limitations ultimately determined in the ALJ's RFC – there were jobs available to Plaintiff. *See* Tr. 47-48. This satisfies the Commissioner's burden at Step Five. To the extent, thus, that Plaintiff argues the ALJ was necessarily required to include greater limitations simply because he asked the VE about them at the hearing, this argument must fail.

Plaintiff further contends there is "no discussion of why the Plaintiff was not afforded limitations including but not limited to a sit-stand option and additional breaks when the evidence as a whole shows he is unable to perform many activities of daily living and of those he can accomplish, are done at a much slower than acceptable pace". (Doc. 13, at 22). Plaintiff thus argues these limitations – posed to the VE – should have been included in the RFC. As noted above, there is no requirement that the ALJ do so. However, this argument relies again, in essence, on Plaintiff's subjectively reported symptoms. Because remand is required to re-assess those symptoms, the Court declines to opine further on the necessity of including such restrictions in the RFC or the supportability of their exclusion therefrom. This is for the ALJ to do in the first instance. On remand, the ALJ can re-evaluate Plaintiff's RFC after performing a more through subjective symptom analysis.

20

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying SSI not supported by substantial evidence and reverses and remands that decision pursuant to Sentence Four of 42 U.S.C. § 405(g).


　　　　　　　　　　　　　 s/ James R. Knepp II
　　　　　　　　　　　　　United States Magistrate Judge